IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:26-mj-13 |
| | ) | Case No. 1:26-mj-14 |
| | ) | |
| JORGE STEVE ZEPEDA IRIAS | ) | |
| a/k/a "Tiburcio" | ) | |
| a/k/a "Tiburón," | ) | **UNDER SEAL** |
| | ) | |
| JENIFER ICELA ROMERO FABIAN, | ) | |
| | ) | |
| JUAN FRANCISCO ENRIQUEZ CERRITOS Sr., | ) | |
| a/k/a "Paco," | ) | |
| and | ) | |
| | ) | |
| JORGE MANUEL ROMERO | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINTS AND ARREST
WARRANTS**

I, Ian Meyers, Special Agent of the Federal Bureau of Investigation ("FBI"), being

first duly sworn, depose and state as follows:

**INTRODUCTION**

1.    I submit this Affidavit in support of a criminal complaint and related arrest

warrants charging JORGE STEVE ZEPEDA IRIAS (hereafter "ZEPEDA"), JENIFER ICELA

ROMERO FABIAN (hereinafter "JENIFER ROMERO"), and JUAN FRANCISCO

ENRIQUEZ CERRITOS Sr. (hereafter "CERRITOS"), from in and around July 2024 and

continuing thereafter to at least in and around December 2025, in the Eastern District of Virginia

and elsewhere, with unlawfully, knowingly, and intentionally combining, conspiring,

confederating, and agreeing with each other and with others, known and unknown, to unlawfully, knowingly, and intentionally deal in more than 25 firearms without a license in violation of Title 18, United States Code, Section 371 (conspiracy) and Title 18, United States Code, Section 922(a)(1)(A) (dealing in firearms without a license). I have checked with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and there is no record that ZEPEDA, JENIFER ROMERO, or CERRITOS have a federal firearms license.

2.      I also submit this Affidavit in support of a criminal complaint and related arrest warrants charging JORGE STEVE ZEPEDA IRIAS, JENIFER ICELA ROMERO FABIAN, and JORGE MANUEL ROMERO, from in and around July 2024 to at least in and around December 2025, in the Eastern District of Virginia and elsewhere, with unlawfully, knowingly, and intentionally combining, conspiring, confederating, and agreeing with each other and others, known and unknown, to unlawfully, knowingly, and intentionally possess with intent to distribute more than 1.5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 (conspiracy) and Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

3.      I am a Special Agent with the Federal Bureau of Investigation, and have been since January 2006. I am currently assigned to a squad that investigates criminal enterprises and violent gangs for the Washington Field Office's Northern Virginia Resident Agency. I have training and experience in the areas of gang-related criminal activity, narcotics trafficking, interview and interrogation techniques, evidence recovery, source recruitment, arrest procedures, search and seizure, cellular phone analysis and various other crimes. In my capacity as a Special Agent, I have been involved in the use of the following investigative techniques:

interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants. I have 12 years of previous investigative experience in national security matters and have focused on investigating drug and violent criminal activities for the past eight years.

4.      While with the FBI, I have participated in the investigation of gang members as well as narcotics traffickers and possessors.  I know through training and experience that individuals involved in firearms and narcotics trafficking frequently use cellular telephones to further their illegal activities (a) as the phones allow them to stay in contact with one another without restricting them to a fixed location where they might be the subject of physical surveillance by law enforcement authorities; and (b) because they erroneously believe that the interception of cellular communications is impossible or at least more difficult than interception of landline telephones.  Further, firearms and drug traffickers rarely expressly refer to firearms and controlled substances by name while communicating over telecommunications devices (to conceal the true nature of their illegal activities and to avoid detection by law enforcement, they refer to the firearms and drugs and drug quantities using seemingly innocent terms).

5.      The facts in this Affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and law enforcement personnel.  This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 and 18 U.S.C. § 922(a)(1)(A) (conspiracy to deal in firearms

without a license) have been committed by ZEPEDA, JENIFER ROMERO, and CERRITOS and violations of 21 U.S.C. § 846 (conspiracy) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance) have been committed by ZEPEDA, JENIFER ROMERO, and JORGE MANUEL ROMERO.

## PROBABLE CAUSE

7.    The offenses under investigation arose from a series of controlled purchases of weapons and narcotics utilizing a confidential source (hereafter the "CS," and referred to in the masculine regardless of gender) within the Eastern District of Virginia.  The CS has been paid three times for rental-related assistance and has no criminal history besides illegally crossing the United States border.[1]  All of the controlled purchases have been recorded, and the recordings are consistent with the exchanges as relayed by the CS to law enforcement after the controlled purchases.  In addition, the CS and their vehicle were searched by law enforcement personnel before and after each controlled purchase.  The CS was also followed to and from each controlled purchase by law enforcement personnel with little to no gap in coverage.   Much of the information provided by the CS has also been independently corroborated by law enforcement both in this investigation as well as in previous investigations.  In addition, during previous investigations, the CS was neither paid, nor did they have deferred action status as they were seeking asylum and did not have a prospect of a visa at the time.  For these reasons, I consider the CS reliable.

8.    In and around the summer of 2024, Individual-1 told the CS that he had a friend who could get the CS weapons without serial numbers on them. Thereafter, Individual-1

---

[1] The confidential source has been granted a temporary deferred action by the U.S. government and law enforcement is pursuing a visa.

introduced the CS to ZEPEDA. (I learned that ZEPEDA uses the nicknames "Tiburcio," which is the name Individual-1 knew him by, and "Tiburón," which is what ZEPEDA later told the CS was his nickname. Tiburón is the name for "shark" in Spanish. However, for the sake of clarity, I will refer to ZEPEDA by the name ZEPEDA going forward in this Affidavit). Individual-1 said that ZEPEDA's phone number was 703-XXX-8781.

9.    Further investigation revealed that Tiburcio's true name was JORGE STEVE ZEPEDA IRIAS and that the Prince William County Police Department ("PWCPD") had a cooperating witness (hereafter the "CW") who witnessed ZEPEDA with a "van full of weapons." The CW believed ZEPEDA to be associated with Mexican cartels and had heard that ZEPEDA had tried to sell grenade launchers in the past. The CW also noted that ZEPEDA can sell ammunition and cocaine, as well as weapons. FBI internal database checks revealed ZEPEDA's phone number to be associated with four additional investigations, with three of them in other FBI field offices.

10.    Additionally, a U.S. Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") task force officer conducted records checks through Department of Homeland Security ("DHS") databases that contain known and previously deported aliens, and U.S. Citizenship and Immigration Services ("USCIS") databases that contain petitions and applications pending with USCIS filed by U.S citizens, persons with legal status, and aliens. ZEPEDA was arrested by ICE on July 15, 2013 and placed into removal proceedings. ZEPEDA's immigration case is currently ongoing; he has a removal order, which he has been appealing, and he has additionally filed for permanent resident status.

11.    Further, ZEPEDA has a criminal history. He was charged in Prince William General District Court with brandishing a firearm in September 2023. This charge was reduced

to misdemeanor disorderly conduct in February 2024, to which ZEPEDA pled guilty. ZEPEDA was also charged in Loudoun County General District Court with felony larceny in July 2013 and failure to appear in March 2014. The government has not been able to ascertain how both charges were resolved, however, it appears that the charges are no longer pending.

12.     As described below, from in and around July 2024 to at least in and around December 2025, ZEPEDA sold numerous firearms (both pistols and rifles) as well as cocaine and fentanyl in controlled sales to the CS, all of which were recorded. All of ZEPEDA's firearms sales to the CS took place in the Eastern District of Virginia, and all of ZEPEDA's narcotics sales to the CS either fully took place in the Eastern District of Virginia or started in the Eastern District of Virginia and were completed in Washington, DC. The CS communicated with ZEPEDA to set up each purchase, and law enforcement searched the CS and provided pre-recorded buy funds prior to each buy. Law enforcement also monitored and conducted surveillance for each buy and retrieved the weapons and substance(s) purchased, searched the CS, and debriefed the CS after each buy.

13.     On or about July 17, 2024, in Chantilly, Virginia, in the Eastern District of Virginia, the CS and ZEPEDA met for the first time to discuss ZEPEDA's future sale of firearms to the CS. During the meeting, ZEPEDA had in his grey 2016 Dodge Ram Pickup, bearing Virgina license plate UKW9625, two pistols to sell: a Smith & Wesson Beretta pistol and a Sig Sauer pistol. ZEPEDA noted that the Sig Sauer could hold 15 rounds and that he would give the CS two boxes of ammunition with the purchase. ZEPEDA also asked if the CS wanted to shoot the gun to make sure it worked. ZEPEDA brought another individual with him, who sat in ZEPEDA's vehicle during the meeting. Law enforcement was not able to determine the identity of this individual. The CS did not purchase any firearms during this meeting.

14.     However, shortly thereafter, on or about July 26, 2024, the CS conducted a controlled purchase of a P365 Sig Sauer pistol, bearing serial number 66B977231, and a magazine for $850.00 from ZEPEDA at 4210 and 4204 James Madison Highway, Haymarket, Virginia, also known as "Rancho Los Cerritos" or "the Cerritos Ranch" (hereinafter "the Cerritos Ranch"). ZEPEDA also gave the CS two boxes of 9mm ammunition as part of the deal.  The National Crime Information Center ("NCIC") reported this Sig Sauer pistol as being lost on or about September 8, 2023 by an individual who was not ZEPEDA.

15.     The Cerritos Ranch is a contiguous property located at 4210 and 4204 James Madison Highway in Haymarket, Virginia, in the Eastern District of Virginia.  The Cerritos Ranch has been leased to Juan Francisco Cerritos Henriquez, a/k/a "Juan Francisco Enriquez Cerritos, Sr.," a/k/a "Paco," and Maria Cerritos by Pluto L.C. and John F. Wells since 2009, which encompasses all times pertinent to this investigation.  CERRITOS is the lessee of the Cerritos Ranch and ZEPEDA is the manager of the Cerritos Ranch.

16.     The Cerritos Ranch is a nearly 40-acre rural property in Haymarket, Virginia, that also contains a small lake.  The Cerritos Ranch operates as a multi-use property.  Farming and livestock operations occur at the Cerritos Ranch, as well as the sale of meat, poultry, and vegetables.  The Cerritos Ranch also contains a pavilion-style open air restaurant.  The Cerritos Ranch also contains a main house (occupied by Cerritos, his wife, and guests), trailers, and other outbuildings where individuals reside and/or stay for periods of time.  Based on surveillance, it is common for numerous vehicles to be parked and/or stored at the Cerritos Ranch.

17.   **Photograph of the Front of the Cerritos Ranch from the Street**



18.   **Satellite View of the Cerritos Ranch**



19.    On or about August 2, 2024, the CS again met with ZEPEDA at the Cerritos Ranch, and purchased an Arsenal AK-47, Model SAM7SF, bearing serial number BE532185, and five magazines, some with ammunition in them, for $2,000.00. NCIC checks did not reveal any records for this weapon and ATF E-Trace revealed an original purchase date of July 14, 2018 by an unknown party in Dallastown, Pennsylvania. During the controlled purchase, the CS noted

to ZEPEDA that there were three individuals at one of the outbuildings eating lunch.  ZEPEDA told the CS that he knew the individuals and that they would not call the police so the CS should not worry about it.  Additionally, ZEPEDA showed the CS a 9mm pistol and told the CS he also had a Beretta firearm.

20.     On or about August 25, 2024, the CS met with ZEPEDA and others at the Cerritos Ranch for rapport building and to discuss the purchase of additional weapons.  ZEPEDA did not sell anything to the CS at this meeting, however, during the meeting, the CS noted ZEPEDA was carrying a .357 magnum handgun in his waistband.  ZEPEDA also told the CS that one of the Hispanic males with them was his boss (whom the CS confirmed to be CERRITOS after being shown a photo during the debrief following the meeting) and his boss maintains all the weapons in a safe.  ZEPEDA showed the CS an AR-15 in ZEPEDA's red truck.  Shortly thereafter, CERRITOS walked over to the red truck carrying a 9mm firearm.  At least one other Hispanic male as well as ZEPEDA's wife, Jenifer ROMERO, was present at the Cerritos Ranch. CERRITOS is originally from El Salvador and currently has status in the United States as a legal permanent resident ("LPR") which he obtained in 2006. However, he has not filed for naturalization, and he has not renewed his work status permit.  CERRITOS does not have a criminal record in the United States.

21.     On or about August 28, 2024, the CS again went to the Cerritos Ranch for a controlled purchase.  Initially ZEPEDA was not at the location and the CS met with CERRITOS. During their discussion, they discussed El Salvador generally and CERRITOS volunteered that he had killed a man in El Salvador and then left the country but did not provide further details. Upon ZEPEDA's arrival, ZEPEDA, CERRITOS, and the CS walked over to a red Dodge Ram pickup truck where two pistols were stored inside a compartment.  ZEPEDA retrieved the two

pistols and gave them to the CS. The CS handed ZEPEDA $1,650 for the purchase of the two firearms. ZEPEDA then handed the same money from the purchase to CERRITOS and told the CS that one of the guns was CERRITOS's and that the guns were untraceable because they were bought second-hand and not in a gun store. ZEPEDA and CERRITOS also offered the CS another pistol during this controlled purchase, which the CS did not purchase.

22.    The pistols ZEPEDA and CERRITOS sold the CS were: a Fabrique Nationale Herstal Belgique 9mm pistol, bearing serial number 245NM03967, containing one magazine with seven rounds of ammunition, and a Taurus PT111 Millennium G2 9mm pistol, bearing serial number TJZ92181, containing one magazine with three rounds of ammunition. Both firearms were wrapped in a long sleeve shirt. NCIC shows no record for either weapon. An ATF E-Trace of the Fabrique Nationale Herstal Belgique 9mm pistol shows only dealer information and no purchaser information. An ATF E-Trace shows that the Taurus PT111 was purchased on June 7, 2017 by a third party of unknown association to the investigation in Front Royal, Virginia.

23.    On September 19, 2024, the CS again went to the Cerritos Ranch for a controlled purchase of an AR-15. Upon arriving at the location, the CS was sitting in ZEPEDA's truck talking with ZEPEDA when an unknown black male unexpectedly arrived who ZEPEDA believed had a gun with him. ZEPEDA grabbed his own pistol from the center console of the truck they were in, loaded it, and then got out of his truck, and went to the black male's truck and told the black male words to the effect of you are not supposed to be here and we can't do drug deals here. The black male then departed the Cerritos Ranch. The CS also noted an AK-47 under the back seat of ZEPEDA's truck while the CS was in the vehicle. Surveillance teams later saw ZEPEDA leave the Cerritos Ranch driving his gray Dodge Ram pickup truck bearing Virginia license plate UKW9625.

24.     After the interaction with the unknown black male, ZEPEDA, CERRITOS, and the CS went to a location at the Cerritos Ranch where they test fired the AR-15.  The CS subsequently gave ZEPEDA $2,000 for the purchase of an AR-15 rifle, bearing serial number MTS04612, and ZEPEDA then handed the money to CERRITOS.  CERRITOS told the CS that he also had a sniper rifle he could sell the CS.  After this, ZEPEDA drove the CS to the house that is located on the same property.  CERRITOS went inside the house and returned with numerous rounds of .223 and 5.56 ammunition that he handed to the CS so that the CS could use them with the AR-15.  ZEPEDA and CERRITOS then left the Cerritos Ranch together in the same vehicle.  Shortly thereafter, ZEPEDA called the CS and told the CS that he had an automatic weapon to sell.

25.     On or about November 15, 2024, the CS purchased from ZEPEDA four firearms for $4,100 at the Cerritos Ranch.  The firearms were: a CN ROMARM 5A/CUGIR AK-47, 7.62 x 39mm caliber rifle, bearing serial number ED3426; a Kel-Tec .380 caliber pistol, bearing serial number HUE76; a Phoenix Arms, Model HP22A, .22 caliber pistol, bearing serial number 4079101; and a Kimber, Black Micro 9, 9mm caliber pistol, bearing serial number PB0411385, along with various ammunition rounds.  All firearms were run through NCIC and ATF E-Trace.  Of note, the Kimber 9mm pistol was reported as stolen in Fairfax County, Virginia on December 26, 2023.

26.     During the meeting in November 2024, ZEPEDA told the CS that he had been doing business with the gang Mara Salvatrucha 13 ("MS-13") and had known them for 20 years and specifically mentioned an MS-13 boss in Philadelphia.  ZEPEDA also discussed purchasing a kilogram of cocaine and how much profit could be made from selling it.

27.     On or about December 4, 2024, the CS conducted another controlled purchase

from ZEPEDA at the Cerritos Ranch during which ZEPEDA sold the CS the following: a PMG KAHR Arms, 9mm caliber pistol with a magazine; a Polymer80, Inc. pistol with two magazines; six rounds of ammunition; approximately 7.5 grams of cocaine; and 12 pills of presumed narcotics. The CS paid ZEPEDA a total of $2,550 for all of these items.

28.     The cocaine field tested positive for the presence of cocaine, the pills field tested negative for narcotics, and neither gun had a serial number. Of note, I discussed these pistols with an Alcohol, Tobacco, Firearms, and Explosives ("ATF") special agent familiar with the matter, and was told that both pistols are considered privately manufactured firearms ("PMFs") or "ghost guns," and, as such, do not have serial numbers on them. Without serial numbers, it is not possible to run traces on these firearms.

29.     On or about December 28, 2024, ZEPEDA asked the CS to meet him at the ZEPEDA and ROMERO residence. ZEPEDA provided the address 42549 Braddock Road, Chantilly, VA 20152 (hereinafter "the ZEPEDA and ROMERO residence"), which is in the Eastern District of Virginia. While the CS was outside the residence, ZEPEDA came out of the house and showed the CS seven firearms. One of the firearms had what ZEPEDA claimed to be a silencer, one of the rifles was a .300 blackout, and another firearm was a Glock .45 ACP with an extended magazine. ZEPEDA took the pistols out of a silver truck, and he brought the long guns out of the house. ZEPEDA did not sell the CS any firearms at this time.

30.     Approximately two weeks later, on January 10, 2025, ZEPEDA sold the CS, in a controlled purchase, two firearms and an old BMW sedan parked at the Cerritos Ranch. One day before this controlled purchase, ZEPEDA met the CS at the Cerritos Ranch and told the CS that the current owner of the BMW is the current "boss" of MS-13 in Virginia and that he took the car from another individual who did not pay for the kilogram of cocaine that he was supposed

to pay for. ZEPEDA noted that he got permission from the MS-13 "boss" to sell the vehicle but that he needed to be careful who he sold it due to evidence inside the vehicle. During the same conversation, ZEPEDA told the CS that he had sold over 100 guns to MS-13 in the past.

31.    On or about January 10, 2025, at the Cerritos Ranch, ZEPEDA sold to CS in a controlled purchase the following items for $6,400: a BMW vehicle; a Glock, Model 38, .45 caliber pistol, bearing serial number HCD233, with three magazines; and a Kel-Tec, Model PLR-22, .22 caliber pistol, bearing serial number U3362, with what appeared to be a sound suppressor, a scope, and a magazine. I asked the ATF to determine whether this "suppressor" fit the legal definition of a suppressor and was told that it did not. Both weapons were run through NCIC, showing no record of being stolen, as well as ATF E-Trace, which showed no records of significance. Of note, however, the magazine from the Kel-Tec PLR-22 had a compartment that had small orange pellets in it. When the CS questioned ZEPEDA about this, ZEPEDA noted that this was intended to trick law enforcement into thinking the weapon was not a real firearm. During this controlled sale, ZEPEDA removed and showed to the CS several additional weapons from his truck that he wanted to sell for $8,000, including a Smith & Wesson .38, a Smith & Wesson 9mm, a 300-blackout rifle, a Taurus 9mm, an unknown rifle, and a small unknown type of pistol. The CS did not purchase these additional weapons.

32.    On or about January 16, 2025, ZEPEDA sold the following five firearms to the CS during a controlled purchase at the Cerritos Ranch: a Ruger AR-556, semi-automatic AR-15 style rifle, bearing serial number 854-32521, with two magazines; a Taurus .40 caliber pistol, bearing serial number SKP25544, with five rounds of ammunition loaded in the magazine that was inserted in the weapon; a Beretta 9mm pistol, bearing serial number AXC046003, with five rounds of ammunition in the magazine that was inserted in the weapon and one round in the

chamber; a Dan Wesson Arms .32 caliber revolver, bearing serial number F001084; and a Smith & Wesson .38 caliber revolver, bearing serial number 96K4530. Additionally, ZEPEDA included in the sale a 31-round high capacity 9mm Glock magazine, a holster, a rifle scope, and various rounds of loose ammunition. NCIC was run on all of these weapons and of note, the Taurus pistol, bearing serial #SKP25544, was reported as stolen. ATF E-Traces were also run on these weapons and no commonality or other notes of interest was found among these weapons. The CS paid ZEPEDA a total of $9,000 for all of these guns and approximately 57 grams of what were believed to be narcotics. It was later discovered that this approximately 57 grams did not contain a traceable amount of narcotics.

33.    On or about February 27, 2025, during an attempted fentanyl purchase at ZEPEDA and ROMERO's residence, while waiting to meet with the secondary supplier, ZEPEDA received a phone call from DOUGLAS LNU that was overheard by the CS and further explained by ZEPEDA after the phone call. DOUGLAS LNU called ZEPEDA from a detention center stating that he was pulled over with someone who had a kilogram of drugs with him and that he was getting deported out of the United States. ZEPEDA relayed to the CS that DOUGLAS would be brought back to the United States for $17,000. ZEPEDA also placed a call to an individual via WhatsApp who ZEPEDA relayed would bring DOUGLAS back to the United States. ZEPEDA then showed the CS a picture of an Uzi pistol that he said he would sell for $2,000 and would include three 52 round magazines.

34.    On or about April 8, 2025, ZEPEDA facilitated the sale of "Perc 30s," counterfeit blue pills made to look like 30 mg oxycodone, to the CS by an individual named HECTOR LNU in a controlled sale. Initially, the CS, ZEPEDA, and HECTOR met at ZEPEDA and ROMERO's residence. HECTOR then went with ZEPEDA and the CS to a location in Gainesville, Virginia,

in the Eastern District of Virginia, to meet with a third party. There, HECTOR purchased approximately 11.6 grams of "Perc 30" pills for $800 with money given to him by the CS as part of the controlled purchase. ZEPEDA kept an additional $700 from the CS as a commission for facilitating the transaction. After leaving Gainesville, HECTOR was dropped off at a house in Catharpin, Virginia, in the Eastern District of Virginia, belonging to a relative of CERRITOS. The FBI subsequently submitted the approximately 11.6 grams of pills to the Drug Enforcement Administration ("DEA") laboratory and the DEA laboratory found the pills had detectable amounts of fentanyl.

35.     On or about May 13, 2025, ZEPEDA discharged a firearm in the presence of the CS, brandished another a firearm at the CS, and then sold the CS two firearms and narcotics during a controlled sale outside of ZEPEDA and ROMERO's residence. After the CS arrived at the residence, but before ZEPEDA came out of the residence, the CS looked in ZEPEDA's red Dodge Ram parked outside the residence. The CS saw a rifle under the seat of ZEPEDA's vehicle and a pistol in the compartment near the rear passenger seat, as well as the cocaine which ZEPEDA subsequently sold to the CS.

36.     After ZEPEDA came out of his house, he gave the cocaine in the red Dodge Ram to the CS. ZEPEDA then showed the CS an AK-47 rifle. ZEPEDA struggled to take the safety off of the AK-47. The CS showed ZEPEDA the safety switch. The CS then checked the firearm to see if it was fully automatic but did not think it was. ZEPEDA insisted that it was fully automatic and proceeded to load one bullet into the AK-47. ZEPEDA then fired the AK-47 once toward the ground in his effort to show the CS that the AK-47 was fully automatic.

37.     After ZEPEDA fired the AK-47, the CS and ZEPEDA walked around ZEPEDA's red Dodge Ram to the CS's vehicle. The CS had the AK-47 in hand as the CS approached the

CS's vehicle. ZEPEDA, while holding a backpack, followed the CS to the vehicle. As the CS approached the vehicle, ZEPEDA pulled a revolver from the backpack. The CS also saw a .380 firearm and a 9mm firearm in the backpack. With his right hand, ZEPEDA pointed the revolver at the CS's torso. ZEPEDA had a box of ammunition in his left hand.

38. ZEPEDA, while pointing the revolver at the CS, angrily confronted the CS about whether or not the CS was going to buy other firearms besides the AK-47. ZEPEDA said, in Spanish, words to the effect: "Don't play with me, you made me invest money in this shit, now you need to buy them." The CS felt threatened and felt like the CS had to buy both the AK-47 and another firearm. ZEPEDA charged the CS more money for these firearms than they had previously agreed on with ZEPEDA claiming that an individual whom ZEPEDA called the "Italian guy"—later partially identified as Armand LNU—had to buy additional parts.

39. The CS then paid ZEPEDA $6,000 for an AK-47 rifle, bearing serial number WM02-001173, with a magazine; a Masterpiece Arms, Defender, 9mm pistol, bearing serial number FX25589, with a barrel extension and magazine containing 21 rounds of 9mm ammunition; and several additional magazines and ammunition. NCIC and ATF E-Trace were run on both weapons and, of note, the E-Trace showed that the AK-47 rifle was purchased on December 18, 2015, by JUAN FRANCISCO CERRITOS HENRRIQUEZ, with the registered address of the Cerritos Ranch. I believe this individual to be the defendant CERRITOS because of the similarity in names, both individuals having the same date of birth, both having the same last four digits of their Social Security number, and both being connected with the Cerritos Ranch. There was no record of the other weapon being stolen in NCIC. The Masterpiece Arms Defender has the appearance of an Uzi submachine pistol.

40.     The CS also paid ZEPEDA $1,000 for approximately 15.4 grams of cocaine.  The FBI submitted the cocaine to the DEA laboratory and the DEA laboratory found the submission to have detectable amounts of cocaine.

41.     On or about August 22, 2025, the CS drove to ZEPEDA and ROMERO's residence to conduct a controlled purchase of several guns and a quarter kilogram of cocaine. After the CS arrived at ZEPEDA and ROMERO's residence, ZEPEDA placed a videocall with the CS to individuals claiming to be located in Washington, DC.  The CS saw two black males and a Hispanic male on the videocall.  They told ZEPEDA and the CS that they only conducted large cocaine purchases and were not interested in only selling a quarter kilogram of cocaine. During this videocall, the CS saw one of the black males pull a brick of what he said was cocaine off a shelf and show it to ZEPEDA and the CS.  The CS noted that were 20 or more of these same looking bricks on the shelf from which the black male on the call pulled the first brick.

42.     ZEPEDA then called a different individual, hereinafter Individual-2, who could facilitate a smaller purchase of cocaine and they left ZEPEDA and ROMERO's residence in ZEPEDA's new grey Dodge Ram truck, bearing Virginia license plate TCS 2627, to meet Individual-2 to purchase the cocaine.  Before they left, ZEPEDA asked his wife, JENIFER ROMERO, to come with them for the purchase.  ZEPEDA told the CS that every time he does a deal, he takes his wife and/or daughter with him so that the police won't harass him.

43.     ZEPEDA, JENIFER ROMERO, and the CS then travelled to the vicinity of Courtney Drive in Manassas Park, Virginia, in the Eastern District of Virginia, and picked up Individual-2, and a juvenile female who was approximately two and a half years old.

44.     They then traveled to Byrd Drive in Manassas, Virginia, in the Eastern District of Virginia.  Once there, the CS gave ZEPEDA $1,200 for the cocaine and ZEPEDA and

Individual-2 walked into a residence.  After they returned, the CS gave another $1,000 to ZEPEDA for the cocaine and the CS and Individual-2 walked into the same residence on Byrd Drive that ZEPEDA and Individual-2 had just been in.  There, another person, "Individual-3," had cocaine on the bed.  The CS then had to give another $1,400 to Individual-3 for the cocaine.  After the CS left the residence, ZEPEDA told the CS to "tip" Individual-2 and the CS gave Individual-2 $50.  Before dropping Individual-2 off at a separate location, Individual-2 noted that he could sell a kilogram of cocaine for $28,000.  About the same time, ZEPEDA received a call from an unknown person who told ZEPEDA that they were going to send firearms to the Gulf of Mexico.  During the deal facilitated by ZEPEDA and Individual-2 whom the CS was told to "tip," the CS purchased approximately 86.6 grams of cocaine.  The substance field tested positive for cocaine.

45.    Upon returning to ZEPEDA and ROMERO's residence, with ZEPEDA and ROMERO both present, the CS purchased: a 1 DEL-TON Inc., DTI-15 5.56 caliber rifle, bearing serial number B-16484, that also had a SPARC optic and PMAG magazine; an I.O. Inc. MONROE NC Hellcat .380 caliber pistol, bearing serial number 06156, and a .380 six round magazine that had five Hornady .380 rounds with red tips inside; a Sun City Machinery Co. Stevens, Model 320, 12 gauge shotgun, bearing serial number 132921Q; 15 shotgun ammunition shells of various sizes; two RVA 7.62 x 39 ammunition rounds; and one "WMA 24" round.  The CS paid $800 for the pistol and $2,600 for the two long guns.  NCIC and ATF E-Traces were run for all three weapons.  NCIC did not reflect any of the weapons as being stolen and E-Traces showed nothing of significance.

46.    After the CS purchased the guns, ZEPEDA told the CS that he was planning to pick up a Glock firearm in Woodbridge, Virginia. While still in this truck with ZEPEDA and

ZEPEDA's wife JENIFER ROMERO, ZEPEDA told the CS that the CS was going to pay his wife $300 for helping with the deal that day. The firearms that the CS purchased during this purchase all came from ZEPEDA's new gray Dodge Ram truck bearing Virginia license plate TCS 2627.  Upon exiting that truck, outside of ZEPEDA and ROMERO's residence, the CS observed a magnum .357 Ruger located in the compartment on the side door of ZEPEDA's red truck, as well as a .22 Magnum under the rear seat in that truck.

47.    On or about September 22, 2025, the CS drove to ZEPEDA and ROMERO's residence to conduct a controlled purchase of multiple firearms and a half kilogram of cocaine. After arriving at the residence, ZEPEDA sold the CS a Glock, Model 43X, bearing serial number BNPE575, with a 9mm round in the chamber as well as a magazine with six rounds of 9mm ammunition in it.  The CS paid ZEPEDA $1,500 for this firearm.  ZEPEDA was running late and, instead of giving the Glock 43X to the CS, ZEPEDA retained possession of the Glock 43X and placed it in his bag and then placed his bag and the Glock 43X in his new gray Dodge Ram truck, bearing Virginia license plate TCS 2627.

48.    ZEPEDA then drove the CS and his wife JENIFER ROMERO to the Cerritos Ranch.  At the Cerritos Ranch, ZEPEDA called Armand LNU, whom ZEPEDA referred to as the "Italian guy."  The CS saw that Armand had a 1911 pistol on his person while at the Cerritos Ranch.  Armand had a white Ford F150 pickup truck with an open bed and was selling green beans at the Cerritos Ranch.  Armand took a rifle out of the backseat of the truck.  ZEPEDA asked the CS for $2,500, which the CS provided to ZEPEDA.  ZEPEDA gave the $2,500 to Armand in exchange for the rifle, a Ruger AR15, bearing serial number 1852-23073.

49.    While at the Cerritos Ranch, ZEPEDA met with CERRITOS.  The CS saw CERRITOS with two people whom he suspected were gang members because of the way they

walked and one appeared to be wearing Nike Air Force One shoes and an El Salvador hat. The CS gave ZEPEDA the buy money for another firearm, another $2,500. ZEPEDA told the CS to stay in the car, so the CS stayed in the car with JENIFER ROMERO. The CS saw CERRITOS go inside his house, which is located on the property of the Cerritos Ranch. Then CERRITOS came out of his house with a rifle. The CS saw ZEPEDA give CERRITOS $2,500 and CERRITOS give ZEPEDA the rifle, a Remington 770, 30-06 caliber rifle, bearing serial number 71418219. NCIC was run on each of these firearms and there was no record of them being stolen. ATF E-Traces were also conducted with one name noted as being the name of a person from whom ZEPEDA is believed to be purchasing firearms based on pictures sent to the CS from ZEPEDA with this subject's name on the purchase tag.

50.    Notably, while ZEPEDA was openly conducting these firearms deals with Armand and CERRITOS outside at the Cerritos Ranch, the CS saw at least 20 people at the Cerritos Ranch.

51.    After purchasing these firearms, ZEPEDA, JENIFER ROMERO, and the CS departed the Cerritos Ranch and went to a gas station in the Eastern District of Virginia before driving again. During the drive, JENIFER ROMERO told the CS that MS-13 members are not wearing tattoos lately. ZEPEDA said that he used to sell five guns a week to MS-13. They made social conversation and ZEPEDA said that he used to transport drugs.

52.    ZEPEDA called an unknown individual on a What's App video call. They next went to Arlington, Virginia, in the Eastern District of Virginia, and met with FNU LNU, who would facilitate the half kilogram cocaine deal in Washington, DC.

53.    Specifically, in Arlington, Virginia, they met up with a silver Toyota Tacoma, bearing Maryland tag 7GT7430.  The Toyota Tacoma was driven by a female and had a male passenger, FNU LNU, in the front passenger seat.  FNU LNU told them to follow him.

54.    During the trip, JENIFER ROMERO coached the CS on how to handle themselves with the cocaine seller if they met him.  ROMERO said words to the effect that this individual was a big player.  They continued to follow the Tacoma to the Georgetown neighborhood of Washington, D.C., where they pulled into the old gas station lot located at 3601 M Street NW, Washington, DC, that is also a famous tourist attraction known as "The Exorcist Steps," because the concrete stairs were featured in the 1973 film *The Exorcist*.[2]

55.    When they arrived at the parking lot, the CS noticed a black male with corn rows sitting in a silver Dodge Durango.  The black male gave a "thumbs up" gesture, then departed the area.  Approximately two minutes later, a white Mercedes arrived.

56.    ZEPEDA and LNU exited their respective vehicles, ZEPEDA gave $11,500 from the CS to LNU and got into the cocaine seller's vehicle, the white Mercedes.  The CS later stated that they believed the white Mercedes to be a late model Mercedes that resembled a GL300 model with dark window tint.  The CS and law enforcement were not able to see the cocaine seller because of the dark window tint.  While the license plate of the white Mercedes was not identified during the operation, the CS's description of the white Mercedes is consistent with a white Mercedes later identified by law enforcement, as described below.  ZEPEDA left the CS in ZEPEDA's Dodge Ram with JENIFER ROMERO.  ZEPEDA then purchased a half kilogram of cocaine with $11,500 of the CS's buy money from the cocaine seller in the white Mercedes.  After

---

[2] *See Exorcist* steps, *available at*: https://www.trolleytours.com/washington-dc/exorcist-steps.

the cocaine purchase, ZEPEDA returned to his vehicle, handed the cocaine to the CS, and they drove away shortly thereafter.

57.     After the purchase of the cocaine, ZEPEDA drove JENIFER ROMERO and the CS back to ZEPEDA and ROMERO's residence.  The half kilogram field tested positive for cocaine and the FBI sent it to the DEA's laboratory for further testing.  Subsequently, the DEA chemical analysis report for the approximate half kilogram of cocaine listed the substance as cocaine hydrochloride.

58.     On or about October 21, 2025, the CS drove to ZEPEDA and ROMERO's residence to conduct a controlled purchase of one kilogram of cocaine and two firearms.  Upon arriving at ZEPEDA and ROMERO's residence, ZEPEDA went inside the residence and came out with an AR-15 and put it in a red truck.  ZEPEDA then asked to count the money before he would take the CS "up there."  After counting the money, ZEPEDA made several calls to ensure the deal was ready.  Before leaving the house, the CS paid ZEPEDA a $500 commission for the deal and another $500 for FNU LNU to facilitate the deal.  The CS then paid ZEPEDA another $600 in commission that ZEPEDA had requested multiple times leading up to this meeting for facilitating the half kilogram of cocaine deal on September 22, 2025.  ZEPEDA then asked for another $200 for gas for driving the CS to the deal in his vehicle.

59.     At this point, ZEPEDA, JENIFER ROMERO, and the CS departed the ZEPEDA and ROMERO residence with ZEPEDA driving his grey Dodge Ram truck with Virginia license plate TCS 2627.  They drove to Arlington, Virginia to meet with FNU LNU, the same individual whom they followed to Washington, DC in the silver Toyota Tacoma on September 22, 2025.  This time, FNU LNU did not have a ride so they picked him up and drove him to the "Exorcist Steps" in Washington, DC to conduct the purchase of the one kilogram of cocaine.

60.     When they arrived at the deal location, the CS gave ZEPEDA $23,000 to purchase the cocaine.  ZEPEDA wrapped the money in a black sweater and both he and FNU LNU entered a red Volkswagen Tiguan SE, bearing Washington, DC license plate JF1452 where ZEPEDA purchased the cocaine with $23,000 of the CS's buy money from an individual later identified by law enforcement as JORGE MANUEL ROMERO.

61.     The registered owner in Washington, DC of the red Volkswagen Tiguan SE, bearing Washington, DC license plate JF1452 is JORGE MANUEL ROMERO.  Law enforcement surveillance captured a photograph of JORGE ROMERO—whom the CS later confirmed was the driver of the red Volkswagen Tiguan.  The surveillance photo also matches JORGE ROMERO's DC DMV photo.  Of note, JORGE ROMERO has a 2025 Mercedes GLE Coupe AMG, VIN 4JGFD6BB7SB371000, registered to him in Washington, DC with DC license plate JR9121.  An open source search of publicly available data on this VIN yielded a result of the same make and model vehicle that is black in color.  However, license plate reader images have repeatedly shown a white Mercedes with DC license plate JR9121 that is white in color and law enforcement has photographed a white in color Mercedes with DC license plate JR9121 in the parking garage of the Washington, DC apartment building where JORGE ROMERO resides. I reference the September 22, 2025 cocaine deal where the unidentified cocaine seller arrived in a white Mercedes—the description of which matches the images of a white Mercedes GLE bearing DC license plate JR9121 captured by license plate readers and photographed at JORGE ROMERO's apartment building's garage.  There is no known association or family relationship between JORGE ROMERO and JENIFER ROMERO.  JORGE ROMERO's criminal history includes a conviction for attempted distribution of a controlled substance in 2011 and a

misdemeanor conviction for possession of a controlled dangerous substance-not marijuana in 2019.

62.     Upon exiting the Tiguan, ZEPEDA and LNU returned to ZEPEDA's Dodge Ram—which was still occupied by the CS and JENIFER ROMERO.  ZEPEDA brought back a kilogram of cocaine which ZEPEDA gave to the CS and a small amount of crack cocaine which he handed to JENIFER ROMERO.  The CS requested and obtained half of this crack cocaine from ZEPEDA.  The kilogram and the crack field tested positive for cocaine and the FBI sent both to the DEA's laboratory for testing.  Subsequently, the DEA chemical analysis report for the approximate kilogram of cocaine listed the substance as cocaine hydrochloride and listed the other substance as cocaine base in rock-like form.

63.     Based on my training and experience, there is probable cause to believe that JORGE MANUEL ROMERO sold the cocaine to ZEPEDA and the CS in both instances for the following reasons: the September and October cocaine buys were the only cocaine deals the CS made with ZEPEDA that took place in Washington, DC; both of these cocaine deals involved significantly more cocaine than any of ZEPEDA's previous sales to the CS; both cocaine deals involved the same facilitator—FNU LNU; both cocaine deals took place in the same location in Washington, DC; the two deals took place only a month apart; and JORGE ROMERO has both a Mercedes and a Volkswagen registered in his name in Washington, DC.

64.     ZEPEDA, JENIFER ROMERO, LNU, and the CS then departed the parking lot and drove to Arlington, Virginia, and dropped off LNU.

65.     After dropping off FNU LNU, ZEPEDA, JENIFER ROMERO, and the CS went back to ZEPEDA and ROMERO's residence.  Once back at the residence, ZEPEDA removed the AR-15 from his red truck and handed it to the CS.  The CS purchased this Stag Arms model Stag-

13 AR15, bearing serial number 41444, and two empty metal magazines from ZEPEDA for $2,600.  The CS had planned to purchase two pistols from ZEPEDA, but ZEPEDA said this is what he was selling to the CS.  An NCIC query of this firearm shows no record of being stolen and an ATF E-Trace that does not indicate anything significant.

66.    On or about December 11, 2025, the CS conducted a controlled purchase of six firearms and various ammunition at the Cerritos Ranch.  Upon arriving at the Cerritos Ranch, the CS saw CERRITOS, JENIFER ROMERO, and ZEPEDA.  ZEPEDA told the CS that the firearms were in ZEPEDA's red truck.  The CS got into ZEPEDA's red truck and paid $15,000 for only six firearms when he was supposed to get eight firearms from ZEPEDA.  When the CS pushed back on this, ZEPEDA told the CS that the Uzi was special and that the firearms are very expensive.

67.    After the CS paid ZEPEDA, ZEPEDA tried to call a contact who could register a firearm in the CS's name.  ZEPEDA did not tell the CS the contact's name, but the contact told ZEPEDA that the contact had an AR for sale for $1,800.  The CS also asked if they could purchase narcotics while they were still at the Cerritos Ranch, but ZEPEDA said that he did not have any narcotics at the Cerritos Ranch at that time, but if the CS had told him earlier, he could have set up a deal.  ZEPEDA also told the CS that he has an M60 at the ZEPEDA and ROMERO residence.  From my training and experience, I know that an M60 is a type of machinegun.  ZEPEDA also told the CS that the CS needs to buy more than two kilograms of cocaine the next time the CS buys cocaine from ZEPEDA.

68.    The various evidentiary items  that ZEPEDA sold the CS during this controlled purchase were: a Double Star Corp, Star 15, Multi Caliber, black rifle, bearing serial number D0025056 (with one magazine); a Sarsilmaz, Sar 9 Mete, 9mm caliber, tan pistol, bearing serial

25

number T1102-22CD63068 (with two magazines); a Beretta USA Corp, APX A1, 9mm caliber, black pistol, bearing serial number AXC178064 (with one magazine); a Glock, Model 17, 9mm caliber, black pistol, bearing serial number AGV040 (with attached light and one extended magazine); a Masterpiece Arms, Model M10 (45 ACP), .45 caliber, black pistol, bearing serial number A4655 (with two magazines and a cosmetic "suppressor"); a Ruger, Model GP100, .357 caliber, black revolver, bearing serial number 170-22747; 16 rounds of .45 caliber ammunition in a plastic bag; and 48 rounds of various assorted calibers of ammunition.

## CONCLUSION

69.     Based on the foregoing, I respectfully submit that there is probable cause to believe that from in and around July 2024 and continuing thereafter to at least in and around December 2025, in the Eastern District of Virginia and elsewhere, the defendants JORGE STEVE ZEPEDA IRIAS ("ZEPEDA"), JENIFER ICELA ROMERO FABIAN ("JENIFER ROMERO"), and JUAN FRANCISCO ENRIQUEZ CERRITOS Sr. ("CERRITOS"), and others, known and unknown, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown, to unlawfully, knowingly, and intentionally deal in more than 25 firearms without a license in violation of Title 18, United States Code, Section 371 (conspiracy) and Title 18, United States Code, Section 922(a)(1)(A) (dealing in firearms without a license).

70.     Additionally, based on the foregoing, I respectfully submit that there is probable cause to believe from in and around July 2024 to at least in and around December 2025, in the Eastern District of Virginia and elsewhere, ZEPEDA, JENIFER ROMERO, and JORGE MANUEL ROMERO unlawfully, knowingly, and intentionally combined, conspired, confederated, and agreed with each other and others, known and unknown, to unlawfully, knowingly, and intentionally possess with intent to distribute more than 1.5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 (conspiracy) and Title 21,

United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

Respectfully submitted,

_____
Ian Meyers
Special Agent
Federal Bureau of Investigation (FBI)

Subscribed and sworn to in accordance with
Fed. R. Crim. P. 4.1 by telephone on
January 20, 2026.

## Lindsey R Vaala

Digitally signed by Lindsey R Vaala
Date: 2026.01.20 11:07:05 -05'00'

_____
The Honorable Lindsey R. Vaala
United States Magistrate Judge